**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

SALISA LUSTER HARRISON,

      Plaintiff,

      v.

RICK WOOLRIDGE, BRIAN TUCKER,
ROBERT C. WHITE, MICHAEL SULLIVAN,
STEVE CONRAD, DEE ALLEN, CAREY
KLAIN, DAVID RAY, DAVID ALLEN,
CAROLYN NUNN, KEN CHRISTIAN,
ANN COHEN, TODD FELTY and
JOHN DOES 1–7, all individually,

      Defendants.

Case No. 3:18-CV-388 GNS/LLK

***JURY TRIAL DEMANDED***

**SECOND AMENDED COMPLAINT**

NOW COMES, Plaintiff, SALISA LUSTER HARRISON, by and through her attorneys, and for her cause of action, states as follows:

**INTRODUCTION**

1.    The Louisville Metropolitan Police Department (hereafter "LMPD") Law Enforcement Code of Ethics reflects the purported LMPD belief that serving the community, protecting the innocent against deception, and respecting the constitutional rights of all to liberty, equality and justice are among the fundamental duties LMPD police officers are required to fulfill. The LMPD pledges that it shall perform its duties with an unwavering commitment to integrity, professionalism and dependability. The LMPD states that it will be accountable to those it serves for its decisions and actions.

2.    Unfortunately, the letter and spirit expressed in this law enforcement code were absolutely nowhere to be found on April 29, 2008, as SALISA LUSTER HARRISON (hereafter

"SALISA")–who had been viciously beaten, strangled and sexually assaulted–was callously ignored by LMPD officers, RICHARD WOOLRIDGE (hereafter "WOOLRIDGE") and KEN CHRISTIAN (hereafter "CHRISTIAN"), and essentially left for dead after a brutal attack in her home.  Indeed, SALISA had suffered serious physical injuries–including a traumatic brain injury– during the attack, which was carried out by a currently unknown assailant(s).  Were it not for the fact that her co-worker friends persisted in the face of LMPD ambivalence and obstruction, SALISA might very well not be alive today.

3.     The letter and spirit expressed in the code were nowhere to be found on April 30, 2008, as other LMPD officers, BRIAN TUCKER (hereafter "TUCKER"), ANN COHEN (hereafter "COHEN") and TODD FELTY (hereafter "FELTY") took affirmative steps to conceal the misconduct of their colleagues, WOOLRIDGE and CHRISTIAN, and to deprive SALISA of equal protection of the laws.  TUCKER, COHEN and FELTY intentionally mishandled and ignored crucial physical evidence at the crime scene, paving the way for WOOLRIDGE and CHRISTIAN to avoid accountability for their actions and for the decade-long deprivation of justice for SALISA.

4.     Worse yet, after years of diligently trying to learn the facts comprising her attack, after years of begging the LMPD officials to properly investigate her sexual assault and to identify her attacker, defendants, specifically, DAVID ALLEN, told SALISA in December 2016 that LMPD would re-test her remaining rape kit evidence, the type of which is administered only to female rape victims.  For a fleeing moment, SALISA believed that the justice she fought so hard for was forthcoming.

5.     However, this was just another cruel misrepresentation in a series malicious institutional falsehoods from LMPD officials.  To wit, in December 2016 correspondence to

2

SALISA, DAVID ALLEN lied to her outright, telling her the re-test was performed but yielded inconclusive results yet again. This official communication from DAVID ALLEN, a high-ranking LMPD official, to SALISA, a sexual assault victim, was utterly, knowingly false. In fact, DAVID ALLEN and the other defendants affirmatively prevented the DNA comparison testing of SALISA's rape kit in 2016 in the hope that it would never be tested, and that SALISA's attacker(s) would never be identified, charged or criminally prosecuted.

6.      Thus, the letter and spirit expressed in the code above have been decidedly absent for over a decade as defendants and other LMPD officials lied, concealed and misrepresented facts to SALISA and her mother, Cheryl Ellis (hereafter "Ms. Ellis"), in an effort to frustrate their tireless quest for justice for SALISA. Defendants did this in order to conceal the discriminatory actions of WOOLRIDGE, TUCKER and other defendants and, ultimately, to deny SALISA court access and to deprive her of equal protection of the laws.

7.      The fraudulent and callous misconduct that began with WOOLRIDGE's intentional investigation failures marked the beginning of a more than decade-long pattern of deceit, lies, cover-ups, misrepresentations, fraud and widespread conspiracy, all of which was aimed at concealing the malicious acts of WOOLRIDGE and subsequent state actors described *infra*. The conspiracy permeated every level of WOOLRIDGE's LMPD chain of command, all the way up to the Chief of Police. It also conceivably spread to other members of the LMPD, as well as to the Kentucky State Police (hereafter "KSP").

8.      As described below, when SALISA's calls for justice and accountability grew too loud, the defendants lied to her. This occurred on more than one occasion, spanning many years.

9.      The nature and depth of the police misconduct committed against SALISA by the defendants in the matter was staggering and cannot be overstated. Defendants violated their own

policies and guidelines, not only in the deliberate investigation failures that plagued SALISA's case, but also in the deliberate mishandling and compromising of vital physical evidence. None of the many clear policy violations was ever addressed by the LMPD at any time.

10.      These intentional acts and omission of which SALISA herein complains constitute fraudulent acts, which violated several LMPD policies, and have permanently deprived her of her constitutional rights, continued for over a decade up to, and including, December 2017, and beyond.

11.      SALISA now brings this lawsuit to enforce the Constitutional rights afforded her under the First and Fourteenth Amendments to the United States Constitution. SALISA demands trial by jury.

## JURISDICTION AND VENUE

12.      This action arises under the United States Constitution, particularly under the First and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871 and 42 U.S.C. § 1983. This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1367. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which SALISA complains arose in this District.

## PARTIES

13.      At all relevant times, SALISA was a citizen of the United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America. In April 2008, SALISA resided in Unit #3 of the East Chase Apartments, located at 1623 Huntington, Louisville, Commonwealth of Kentucky.

14.     In April 2008, and at all relevant times, WOOLRIDGE was employed by the Louisville Metro Government (hereafter "Louisville Metro") as a police officer and was acting under the color of state law, within the scope of his employment.

15.     In April 2008, and at all relevant times, CHRISTIAN was employed by Louisville Metro as a police officer and was acting under the color of state law, within the scope of his employment.

16.     In April 2008, and at all relevant times, TUCKER, was employed by Louisville Metro as a police detective and was acting under the color of state law, within the scope of his employment.

17.     In April 2008, and at all relevant times, ROBERT C. WHITE (hereafter "WHITE"), was employed by Louisville Metro as the LMPD Chief of Police, and was acting under the color of state law, within the scope of his employment.  In April 2008, and at all relevant times, WOOLRIDGE and TUCKER were within WHITE's chain of command.

18.     In April 2008, and at all relevant times, MICHAEL SULLIVAN (hereafter "SULLIVAN"), was employed by Louisville Metro as a police sergeant and was acting under the color of state law, within the scope of his employment.  In April 2008, and at all relevant times, SULLIVAN was WOOLRIDGE's supervising sergeant and within WOOLRIDGE's chain of command.  In April 2016, SULLIVAN was promoted to LMPD Deputy Chief of Police.

19.     In 2011, and at all relevant times, DEE ALLEN (hereafter "DEE ALLEN"), was employed by Louisville Metro as a police officer or member and was acting under the color of state law, within the scope of her employment.

20.     In 2011, and at all relevant times, CAREY KLAIN (hereafter "KLAIN"), was employed by Louisville Metro as a police officer or member and was acting under the color of state law, within the scope of her employment.

21.     In 2012, and at all relevant times, STEVE CONRAD (hereafter "CONRAD"), was employed by Louisville Metro as the LMPD Chief of Police and was acting under the color of state law, within the scope of his employment.  In 2012, and at all relevant times, TUCKER was within CONRAD's chain of command.

22.     In 2015, and at all relevant times, DAVID RAY (hereafter "RAY"), was employed by Louisville Metro as a police officer, was a Major in rank, and was acting under the color of state law, within the scope of his employment.

23.     In 2016, and at all relevant times, DAVID ALLEN (hereafter "DAVID ALLEN"), was employed by Louisville Metro as a Special Victims Unit Coordinator, was a lieutenant in rank, and was acting under the color of state law, within the scope of his employment.

24.     In 2015, and at all relevant times, CAROLYN NUNN (hereafter "NUNN"), was employed by Louisville Metro as a Special Victims Unit Coordinator, was a Lieutenant in rank, and was acting under the color of state law, within the scope of her employment.

25.     In April 2008, and at all relevant times, COHEN was employed by Louisville Metro as a police officer and was acting under the color of state law, within the scope of his employment.

26.     In April 2008, and at all relevant times, FELTY was employed by Louisville Metro as a police officer and was acting under the color of state law, within the scope of his employment.

27.     At all relevant times, each of the aforementioned named defendants was a "member" with the LMPD, as defined in LMPD policies.

28.     At all relevant times, JOHN DOES 1–7, were each employees of Louisville Metro or the Commonwealth of Kentucky, and each acted under color of state law.  Though JOHN DOES 1–7 are currently unidentified by SALISA, she alleges herein that each of them engaged in various tortious and unconstitutional acts and omissions which caused her physical and emotional pain and injuries.  Upon information and belief, SALISA avers that the true identities of JOHN DOES 1–7, will be ascertained during court-ordered discovery in the matter.

29.     Upon information and belief, Louisville Metro, d/b/a LMPD, is the employer of the individual defendants, is a governmental entity subject to the requirements of 28 U.S.C. § 1983 and which was and is responsible for assuring that the actions, policies and procedures guiding their officers are constitutional and do not deprive citizens of fundamental guaranteed rights.

30.     Louisville Metro is a Commonwealth of Kentucky municipal corporation and is and/or was the employer of defendants, WOOLRIDGE, CHRISTIAN, TUCKER, WHITE, SULLIVAN, CONRAD, DEE ALLEN, KLAIN, RAY, DAVID ALLEN, NUNN, COHEN, FELTY and JOHN DOES 1–7.  Louisville Metro is therefore responsible for the acts of these defendants while they were employed by Louisville Metro and while acting in the scope of their employment.

31.     At all times relevant to this complaint, Louisville Metro was a city with home rule as enabled, defined and empowered under KRS 83.410-83.660, as well as KRS Chapter 83A, 91 and 91A.  Louisville Metro is responsible for the policies, practices and customs of the LMPD.

## LMPD Standard Operating Procedures

32.     At all relevant times, all LMPD members were required to be apprised of the First and Fourteenth Amendments of the United States Constitution, and were required, at all times, to

7

follow the United States Constitution, the laws of the Commonwealth of Kentucky and also to comply with LMPD Standard Operating Procedures ("SOPs").  LMPD SOPs are written orders which apply to all LMPD members such as defendants.  Each member of the LMPD, including defendants, are required to be familiar with the LMPD SOP Manual and must adhere to its directives.

33.     SOP 5.1.2 regards Obedience to Rules and Regulations, and mandates, in part, that members shall obey all rules, orders, polices, and procedures of the department.  Members who violate any of the above may be dismissed or be subject to other punishment, as directed for such a violation.

34.     Moreover, per SOP 5.1.6, the reporting of violations of LMPD policy is mandatory. SOP 5.1.6 states that LMPD "[m]embers knowing, or suspecting, other members of violating any laws, orders, or polices shall report the infraction immediately to their supervisor."

35.     SOP 5.1 pertains to rules and conduct.  SOP 5.1.1 defines "untruthfulness," and reads in pertinent part:

> Untruthfulness is defined as: Intentionally make a false, misleading, or untrue oral or written statement, report, record, and/or communication (including electronic communication); Intentionally failing to accurately report all facts pertaining to an investigation; Intentionally misrepresenting any matter by: Knowingly submitting any false official statement(s) before, to, or during…Any official investigation of the department, including an investigation initiated by a commanding officer.

36.     SOP 5.1.5 elaborates upon the LMPD's truthfulness requirement, stating that "Members are required to be honest and truthful in all matters related to their scope of employment and operations of the department.  Untruthfulness is prohibited and may warrant termination. Untruthfulness is conduct that is intentional, malicious, and/or deceptive and may take one of

several forms, such as an intentionally deceptive action in a formal setting or during an investigation or the submission of deceptive documents.

37.     LMPD officers pledge to be constantly mindful of the welfare of others, and to be honest in thought and deed both in their personal and professional lives.  They pledge to be exemplary in obeying the law and the regulations of their department.

### The April 2008 Brutal Sexual Assault of Salisa Luster Harrison

38.     SALISA was brutally assaulted in her own home on or about April 27, 2008.  Due to her multiple severe injuries she was unable to move from her couch, and this caused her to miss work, which was uncharacteristic.  SALISA's co-workers became concerned by her absence on April 29, and they began efforts to call and locate her.  Unable to reach her via telephone, they decided to go to her apartment, arriving there in the early afternoon.  They saw SALISA's car outside her apartment and began to knock repeatedly at her door and windows, with no response. They continued trying to telephone SALISA but there was no answer.

### The First Call Made to LMPD Seeking Help for SALISA

39.     Gravely concerned for her well-being and safety, SALISA's co-workers then called the LMPD, and explained their belief that she was inside the apartment, and possibly seriously injured.  They knew something was not right, and they requested an emergency citizen welfare check.  The co-workers' call was received by the CITY's dispatch department at approximately 11:12 am on April 29, 2008.

40.     On April 29 at approximately 11:27 am, WOOLRIDGE and CHRISTIAN arrived at SALISA's apartment in response to the co-workers' call.  The co-workers explained the situation to WOOLRIDGE and conveyed to him their adamant belief that something was not right and that they feared that SALISA was inside her home and seriously injured.  They told WOOLRIDGE

that SALISA's absence from work was uncharacteristic, and that her car was parked in front, which was consistent with their fears. WOOLRIDGE entered SALISA's apartment, shutting the door behind him, and preventing SALISA's co-workers from entering to see her.

41. Within five (5) minutes, WOOLRIDGE exited SALISA's apartment and told her co-workers that he had spoken with SALISA. He told them SALISA was upset and had been crying, due to a fight with her boyfriend. WOOLRIDGE told the co-workers that he also spoke with the alleged "boyfriend" inside SALISA's apartment who confirmed everything. WOOLRIDGE advised that "everything is fine," but again prevented the co-workers from entering SALISA's apartment to check on their friend. WOOLRIDGE and CHRISTIAN then entered their LMPD squad car and left the scene.

42. WOOLRIDGE made contact with a male individual inside SALISA's apartment on April 29, 2008.

43. CHRISTIAN entered SALISA's apartment on April 29, 2008.

44. Neither WOOLRIDGE nor CHRISTIAN preserved any potential evidence inside SALISA's apartment at any time.

<u>The LMPD Closes the First Criminal Case in April 2009 Due to<br>Misconduct and Material Misrepresentations by LMPD</u>

45. At approximately 11:36 am on April 29, WOOLRIDGE officially closed the "Event" that was opened by the 11:12 am "check welfare request" related to SALISA. Thus, the case was opened for a total of twenty-four (24) minutes, and WOOLRIDGE and CHRISTIAN spent less than a total of ten (10) minutes at or around SALISA's apartment before leaving the scene.

46. On April 29, 2008, and at all relevant times, WOOLRIDGE and CHRISTIAN were aware of their duties as LMPD police officers, specifically adherence to the following SOPs:

10

- SOP 3.5  (incident reports);

- SOP 3.5.3 (reporting requirements);

- SOP 11.2.2 (evidence procedures);

- SOP 8.50 (sexual assault investigations);

- SOP 8.50.6 (evidence collection in sexual assault investigations);

- SOP 8.35.1 (investigation files);

- SOP 8.35.2 (responsibilities of first responding officer);

- SOP 8.36.4 (aiding the injured);

- SOP 8.36.5 (protecting the crime scene);

- SOP 8.36.6 (controlling persons at crime scenes);

- SOP 8.25.3 (police interviews); and

- SOP 8.50.4 (responding officer duties in sexual assault investigations).

47.    On April 29, 2008, despite full knowledge of their duties as described in the SOPs and awareness of proper police protocol, WOOLRIDGE and CHRISTIAN engaged in willful conduct intended to deprive SALISA of equal protection of the laws and deny SALISA her constitutional right of access to the courts.   To wit, WOOLRIDGE and CHRISTIAN: 1) intentionally failed to create a case file; 2)  intentionally failed to interview or otherwise take an official statement from the male individual WOOLRIDGE encountered inside SALISA's apartment; 3)  intentionally failed to call additional LMPD officers or detectives to investigate, or assist in investigating, the matter; 4) intentionally failed to call for medical assistance or medical treatment for SALISA, despite her visible serious injuries; 5) intentionally failed to obtain witness

information from SALISA's concerned co-workers; 6) and intentionally failed to interview her co-workers, or take their official statements.

48.     WOOLRIDGE and CHRISTIAN failed to collect, preserve or process evidence for DNA and fingerprint analysis.

49.     Neither WOOLRIDGE nor CHRISTIAN drafted a report regarding their April 29, 2008 response to SALISA's apartment.

50.     Moreover, WOOLRIDGE physically prevented SALISA's co-workers from entering her apartment or otherwise providing aid and comfort to their friend, maliciously prolonging SALISA's suffering.  The violence she endured left her clinging to life.  Thus, rather than conduct themselves in a manner consistent with the code and proper police protocol, WOOLRIDGE and CHRISTIAN instead breached the most fundamental of police responsibilities: to protect and serve.  Due to their gender animus, and reflecting a malicious, discriminatory intent, WOOLRIDGE and CHRISTIAN left SALISA in her apartment, motionless and semi-conscious on her couch, battered and clinging to life, with the likely assailant(s) either still in her home or in the immediate vicinity.

51.     Aside from the unconscionable nature of this conduct, WOOLRIDGE and CHRISTIAN's misconduct also resulted in loss of crucial evidence that can never be recovered. WOOLRIDGE and CHRISTIAN's misconduct allowed the alleged "boyfriend" WOOLRIDGE encountered in SALISA's apartment to escape without obtaining his name, address or phone number.  This individual was not SALISA's "boyfriend," nor a platonic friend or acquaintance. Clearly, he was one of her assailants or knew something about the attack.  As of the date of this filing, the identity and whereabouts of this individual are unknown.

52.     In 2008, and at all relevant times, WOOLRIDGE's supervising sergeant, SULLIVAN, was aware of the misconduct committed by WOOLRIDGE during his welfare check of SALISA, who had clearly suffered a physical assault.  Despite this awareness, SULLIVAN did nothing to address the situation or to initiate a review of the matter.  SULLIVAN's silence and intentional supervisory failures constitute violations of SOP 5.1.2 (obedience to rules and regulations), SOP 5.1.6 (reporting violations mandatory) and SOP 8.50.9 (responsibilities of LMPD supervisors in sexual assault cases).

<u>The Second Call Made to LMPD Seeking Help for SALISA</u>

53.     Still gravely concerned about their friend, the co-workers placed a second call to LMPD at approximately 11:45 am.  While they waited for another officer to arrive, the co-workers went to the building manager's office and eventually gained access to SALISA's apartment.  When they entered, they found the apartment to be in extreme disarray–which was very uncharacteristic for SALISA–and it looked as though someone had violently ransacked it.

54.     The co-workers quickly located SALISA, who was lying motionless on her couch in bloodstained clothing.  She had a huge welt on her face, facial bruises, blood in her eyes and was unable to talk coherently due to her overall poor state, which included a swollen tongue.  Based on their observations, the co-workers immediately understood that SALISA had been seriously physically harmed, which was precisely the horrific scenario they feared and tried unsuccessfully to convey to WOOLRIDGE a half hour earlier.  They immediately rushed to her side and tried to comfort her.

55.     Paramedics arrived before any LMPD personnel, and they quickly provided emergency medical services to SALISA who was also experiencing serious respiratory distress.  It was determined that SALISA had been sexually assaulted.  As the paramedics put SALISA on a

stretcher, they expressed to her co-workers their shock and disbelief that a police officer would encounter an individual as obviously in need of immediate medical assistance as SALISA, and yet fail to provide any assistance or even contact medical personnel who could.

56.     SALISA was then emergently transported to University of Louisville Hospital (hereafter "ULH") ER for treatment of her serious injuries, which included a traumatic brain injury. Shortly after her arrival, she suffered a seizure, and was provided extensive emergency treatment. Once SALISA was stabilized, she was physically examined, which included the facilitation of a rape kit, and her injuries were photographed.  It was then learned that SALISA required major brain surgery and other treatment stemming from the assault.

57.     On April 29, 2008 at approximately 11:59 am, TUCKER arrived at SALISA's apartment for the purported purpose of initiating a LMPD criminal investigation of SALISA's attack.  By this time, it was established that SALISA had been violently sexually assaulted by an intruder(s) in her home.  In such cases, the proper identification, preservation, collection and testing of physical evidence is vital to the successful criminal prosecution, a fact known by WOOLRIDGE, TUCKER and all defendants at all relevant times.

58.     On April 30, 2008, TUCKER initiated a LMPD criminal investigation, Case No. CSU 0416208, pertaining to the attack of SALISA, and which was the first such case opened by LMPD.

59.     At that time, and at all relevant times, TUCKER was aware of his duties as a LMPD police officer, specifically, adherence to the following SOPs:

- SOP 3.5  (incident reports);

- SOP 3.5.3 (reporting requirements);

- SOP 11.2.2 (evidence procedures);

- SOP 8.50 (sexual assault investigations);

- SOP 8.50.6 (evidence collection in sexual assault investigations);

- SOP 8.35.1 (investigation files);

- SOP 8.35.2 (responsibilities of first responding officer);

- SOP 8.36.5 (protecting the crime scene); and

- SOP 8.25.3 (police interviews).

60.     On April 29, 2008, despite full knowledge of his duties as described in the SOPs and awareness of proper police protocol, TUCKER engaged in willful conduct intended to deprive SALISA of equal protection of the laws, and to deny SALISA her constitutional right of access to the courts.  He intentionally failed to get witness information from SALISA's concerned co-workers, and intentionally failed to interview them, or take their official statements, and later falsely claimed he did.

61.     TUCKER never spoke to SALISA's co-workers while he was at ULH.

62.     TUCKER never took any formal statements from SALISA's co-workers while he was at ULH.

63.     On April 30, 2008, at approximately 10:30 p.m., TUCKER, COHEN and FELTY executed a search warrant upon the premises of SALISA's apartment.

64.     TUCKER, COHEN and FELTY ignored crucial evidence in SALISA's apartment, most, if not all, of which was vital to SALISA developing both a criminal and a civil case against the assailant(s) who viciously raped, battered and assaulted her.  For instance, TUCKER, COHEN and FELTY: 1) failed to take elimination fingerprints; 2) failed to collect, recover and process a knife found in SALISA's bathroom; 3) failed to collect DNA and fingerprints generally; 4) failed

to collect, recover and process other crucial items of major evidentiary value; 5) failed to interview any contemporaneous witnesses or the apartment staff; and 6) failed to follow up on the identity of the man with whom WOOLRIDGE spoke in SALISA's apartment on April 29, *inter alia*.

65.     On or about April 30, 2008, the day after his arrival on the scene of SALISA's attack, TUCKER drafted his incident report in LMPD Case No. 0416208, which is the first incident report generated by any LMPD member regarding SALISA's initial check welfare request call of April 29.    TUCKER's report was not only unreasonably scant and omission-riddled, but it contained false information, insofar as TUCKER claimed that he had interviewed SALISA's co-workers while at ULH ER, which he most certainly did not.    Stating in an official LMPD report that he had interviewed witnesses when, in fact, he had not, was an affirmative act of fraud and deception.    It is also a violation of SOP 5.1.1 (untruthfulness), SOP 5.1.5 (forms of untruthfulness) and SOP 5.1.3 (conduct unbecoming).    Unfortunately, TUCKER's willful misconduct did not end there.

66.     In violation of proper police protocol and LMPD SOPs, TUCKER then prevented the scant evidence that was collected in the matter–including SALISA's rape kit–from being fully scientifically tested for DNA comparison.    Specifically, WOOLRIDGE, TUCKER and other defendants, including JOHN DOES 1–7, conspired together to prevent the successful DNA testing of SALISA's rape kit, denying her court access and depriving her of equal protection of the laws. In furtherance of the conspiracy, WOOLRIDGE, TUCKER and other defendants, including JOHN DOES 1–7, had SALISA's rape kit pulled from the KSP lab and relegated to the Commonwealth's rape kit backlog among thousands of other neglected kits.    It was the hope and goal of WOOLRIDGE, TUCKER and JOHN DOES 1–7, to put SALISA's rape kit into a practical purgatory, in order to prevent it from being fully tested for DNA comparison.

16

67.     Upon information and belief, as well as based upon the public record, what transpired in SALISA's case–the willful tampering, concealing, compromising and/or destroying of a female rape victim's rape kit while it was in the possession and/or control of LMPD–was not an isolated incident.

68.     Upon information and belief, as well as based upon the public record, there existed at LMPD a historical pattern of tampering, concealing, compromising and/or destroying female rape victims' rape kits while they were in the possession and/or control of LMPD.

69.     The actions of WOOLRIDGE, TUCKER and other defendants, including JOHN DOES 1–7, were in violation of:

- SOP 11.2.4 (DNA evidence);

- SOP 11.6.4 (DNA evidence–special procedures);

- SOP 8.50.2 (investigation of sexual assaults);

- SOP 8.50.5 (detective responsibilities in sexual assault investigations);

- SOP 8.50.8 (sexual assault suspect examinations); and

- SOP 8.50.10 (disposal of sexual assault evidence), *inter alia*.

70.     Despite the fact that WOODRIDGE, TUCKER and other defendants, including JOHN DOES 1–7, knew that SALISA's rape kit was not fully tested, they nonetheless fraudulently and falsely stated to SALISA, the prosecuting attorney's office and others that it had been fully tested, and that the testing had rendered negative results.  This was part of the ongoing conspiracy begun in 2008.

71.     On or about April 13, 2009, based on the negative results fraudulently reported by WOOLRIDGE, TUCKER and other defendants, including JOHN DOES 1–7, the prosecuting attorney's office declined to prosecute SALISA's brutal assault, recommending that it be taken to

17

the county attorney's office for misdemeanor assault charges.   On that same date, the county attorney's office declined to pursue misdemeanor assault charges.  Thus, in April 2009, vindication in the form of criminal prosecution was eliminated.

72.     On or about June 25, 2008, Anthony Dean (hereafter "Mr. Dean") consented to allowing LMPD to collect a buccal swab(s) for DNA testing in the criminal investigation of the attack on SALISA, LMPD Case No. 0416208.

73.     Subsequent to consenting to provide a buccal swab(s) to LMPD, Mr. Dean did provide said buccal swab(s).

74.     On or about July 16, 2008, Frank Clayton (hereafter "Mr. Clayton") consented to allowing LMPD to collect a buccal swab(s) for DNA testing in the criminal investigation of the attack on SALISA, LMPD Case No. 0416208.

75.     Subsequent to consenting to provide a buccal swab(s) to LMPD, Mr. Clayton did provide said buccal swab(s).

76.     Mr. Dean's buccal swab(s) was never analyzed for comparison to other evidence collected in the LMPD criminal investigation of the attack on SALISA, LMPD Case No. 0416208.

77.     Mr. Dean's buccal swab(s) was never used to rule him in or rule him out in terms of his possible involvement in the attack on SALISA.

78.     Mr. Clayton's buccal swab(s) was never analyzed for comparison to other evidence collected in the LMPD criminal investigation of the attack on SALISA, LMPD Case No. 0416208.

79.     Mr. Clayton's buccal swab(s) was never used to rule him in or rule him out in terms of his possible involvement in the attack on SALISA.

80.     On April 13, 2009, TUCKER officially closed the LMPD criminal case  pertaining to SALISA's April 2008 assault.

The LMPD Closes the Second Criminal Case in December 2016 Due to
Misconduct and Material Misrepresentations by LMPD

81.      Despite the closing of SALISA's case, she and Ms. Ellis remained vigilant in their

efforts to determine what happened to SALISA.  Moreover, though they could not put their finger

on it, they feared that something unusual had transpired or was transpiring regarding the LMPD

criminal investigation.

82.      In late 2008, SALISA and Ms. Ellis began to issue questions to WHITE and other

LMPD officials about WOOLRIDGE's conduct during his April 29 investigation of the assault.

They sought review of any files or documents pertaining to the assault which were created by

WOOLRIDGE and any information he may have about the assault.  Along with repeatedly seeking

out evidence, they also actively provided to LMPD officials with information intended to assist

the criminal investigation.

83.      Toward the end of 2008, SALISA told the LMPD, including WHITE, that she

wished to file a citizen complaint against WOOLRIDGE for the willful abdication of his duties on

April 29, 2008 and his failure to properly conduct a welfare check on SALISA.  She was informed

by LMPD officials that her complaint could not be made over the telephone, and she would

therefore need to travel back to Louisville, despite having moved back to her hometown, Little

Rock, Arkansas for her medical treatment.  SALISA was told by LMPD officials that she had all

of February 2009 to make her complaint against WOOLRIDGE.  Based on this representation, and

in reliance thereupon, SALISA and Ms. Ellis traveled that month to Louisville to file the citizen's

complaint against WOOLRIDGE.  However, once they arrived in Louisville, and reached the

LMPD office, they were told that WOOLRIDGE was allowed an early retirement by WHITE in

late January 2009 and, therefore, filing a citizen complaint against him would be pointless.

84.     It is a fact that SALISA and Ms. Ellis expressed the basis of SALISA's citizen complaint against WOOLRIDGE to WHITE and others long before WOOLRIDGE's retirement. However, WHITE stalled and placated SALISA, which served to protect WOOLRIDGE until WHITE could authorize his early retirement, in violation of SOP 2.10.1 (complaints against members) and SOP 2.11 (discipline). Thus, WHITE denied SALISA the fair opportunity to file a citizen's complaint against WOOLRIDGE for his April 29, 2008 investigatory misconduct and thus conspired with other defendants to conceal facts incriminating WOOLRIDGE from SALISA and her mother for over ten (10) years.

85.     In 2009 and 2010, they made *FOIA* requests for information and evidence related to the attack and investigation and received incomplete responses. In August 2011, SALISA and Ms. Ellis made more *FOIA* requests for materials related to the attack and LMPD investigation, as well as information on WOOLRIDGE's background. In response, DEE ALLEN and KLAIN attempted to fraudulently conceal responsive investigation materials requested by SALISA that were disclosable, which was a violation of SOP 3.2.1 (open record requests) and *FOIA* itself. Specifically, these defendants each told SALISA and Ms. Ellis that certain requested materials did not exist which was a false and willful material misrepresentation intended to prevent them from obtaining the materials that could help them better understand the facts of SALISA's case and the investigatory misconduct that plagued it.

86.     Continuing to seek out the truth despite years of institutional intransigence, delay and obfuscation, in April 2012, Ms. Ellis contacted CONRAD, the newly-appointed Chief of Police, and requested that the LMPD re-open its investigation of her daughter's April 2008 assault. SALISA and Ms. Ellis had many questions regarding the LMPD's investigation of the assault, and WOOLRIDGE's conduct during the prior investigation. Ms. Ellis pleaded with CONRAD to use

his authority to find out what happened, warning him that "a very dangerous person is still at large." Despite Ms. Ellis' request, CONRAD did not re-open SALISA's case. SALISA and Ms. Ellis continued to make *FOIA* requests in August 2013 and February 2014 and continued to receive incomplete responses.

A News Report Regarding a Backlog of Rape Kits Unexpectedly Gives Salisa's Quest for Justice Renewed Focus and Reveals Years of LMPD Ambivalence to Sexual Assault Victims

87.     In 2015, statewide audit revealed that Kentucky had a backlog of over 3000 untested rape kits, an event covered by local Louisville television stations. For purposes of this action, the practical effect of this news story is that the defendants now knew that SALISA's untested rape kit would eventually be discovered among those in the backlog. Therefore, sometime in 2015, without contacting SALISA or Ms. Ellis, defendants voluntarily "re-opened" the investigation of SALISA's April 2008 attack, despite prior refused requests. To re-open SALISA's case for this purpose is evidence of an institutional conspiracy, and it moreover confirms that defendants were untruthful in 2009 when they reported that testing was complete and inconclusive.

88.     In order to continue the fraud and conspiracy begun in 2008, defendants needed to control SALISA's rape kit so that they could prevent it from being tested for DNA comparison indefinitely. However, they did not account for the persistence of SALISA or Ms. Ellis. When Ms. Ellis learned of the rape kit backlog through the news story, she focused her communications with LMPD on identifying the victims associated with the backlog, a topic which she previously had no reason to explore. In 2015, Ms. Ellis came into regular contact with NUNN in this regard.

89.     In 2015, NUNN continued the fraud and conspiracy begun years earlier by falsely informing SALISA and Ms. Ellis that the rape kit had been fully tested back in 2008-09 when she

21

knew it had not.  NUNN and defendants falsely told SALISA the reason for the new testing was an advancement in technology when, in fact, the rape kits were never tested the first time.

90.     Despite these representations to SALISA and Ms. Ellis, NUNN in 2016 referred to SALISA's rape kit as one that was "lost in the cracks" when communicating with KSP officials. This is not how she characterized the matter to SALISA.  She never described SALISA's case as one that "fell through the cracks in a lot of areas" when communicating with Ms. Ellis.  Thus, NUNN willfully misrepresented material facts to sexual abuse victim, SALISA, while acting as LMPD Special Victims Unit Coordinator.  In 2015, NUNN also advised KSP officials and other police officers not to share information with SALISA or Ms. Ellis.

91.     In January 2016, RAY was instructed to authorize testing of SALISA's rape kit, but refused to do so, in furtherance of the conspiracy begun in 2008.  It was RAY's intention and desire that SALISA's rape kit not be tested for DNA comparison so that her attacker(s) would not be identified, and no criminal charges could be filed.

92.     Sometime after January 2016, without any advance notice to SALISA or Ms. Ellis, NUNN apparently retired from LMPD, and DAVID ALLEN replaced her as Special Victims Unit Coordinator.  DAVID ALLEN became SALISA and Ms. Ellis' LMPD liaison for purposes of the LMPD's "re-opened" investigation of SALISA's attack.

93.     On or about November 11, 2016, Whitney Collins, a KSP laboratory supervisor, wrote to DAVID ALLEN, explaining that in order to test SALISA's remaining rape kit evidence for DNA comparison in the "re-opened" investigation, KSP would require his written authorization because the needed testing would fully consume–and therefore destroy–the remaining evidence.

94.     Despite his receipt of Ms. Collins' November 11, 2016 correspondence, on or about November 23, 2016, DAVID ALLEN told SALISA that he was "waiting for the letter from

the state lab regarding the final pieces of evidence available for testing," which was a knowing misrepresentation of material fact.  On December 7, 2016, DAVID ALLEN told SALISA that he "did receive a letter form the [KSP] lab letting us know that there is only enough evidence to do one final test."  He then added, "[w]e are working on getting the approval to get that tested quickly," which was a knowing misrepresentation of material fact.

95.     On December 28, 2016, DAVID ALLEN, on official LMPD letterhead, told SALISA that the remaining evidence was, in fact, tested during the "re-opened" investigation, and it did not provide any further information  DAVID ALLEN wrote in pertinent part:

> "Unfortunately, that evidence testing has not provided us with any further information.  With that information, combined with the insufficient evidence for a criminal prosecution, we are closing this case again…Thank you for being patient this last year as we revisited the case."

96.     The reporter described above continued story and determined the  DNA testing that DAVID ALLEN told SALISA was performed and yielded inconclusive results actually had not been performed.  DAVID ALLEN's December 28, 2016 correspondence to SALISA was a knowing misrepresentation of material fact and constitutes a continuation of the conspiracy alleged herein.

97.     On or about December 8, 2017, a news reporter covering the developing rape kit backlog story personally informed SALISA and Ms. Ellis that the DNA testing DAVID ALLEN stated was performed was, in fact, not performed.  This December 8, 2017 communication to SALISA and Ms. Ellis signifies the first confirmed indication of a more than decade-long conspiracy, previously unknown to SALISA and Ms. Ellis due to the clandestine improper acts of the defendants.  SALISA has since obtained LMPD email from 2018 which substantiate her claims

that she and her mother were affirmatively lied to by defendants for, again, a period of over ten (10) years.

98.     That the aforesaid intentional acts and omissions constituting fraudulent concealment began with WOOLRIDGE intentionally concealing information and evidence related to SALISA's attack and, as far as SALISA is aware, have continued to this day.

99.     That the aforesaid intentional acts and omissions constituted positive acts of fraud that were furtively planned and secretly executed by the above LMPD members, including WOOLRIDGE, CHRISTIAN, TUCKER, WHITE, SULLIVAN, CONRAD, DEE ALLEN, KLAIN, RAY, DAVID ALLEN, NUNN, COHEN, FELTY and JOHN DOES 1–7, in order to keep the fraud concealed.  That these transgressions served to conceal material facts which were not discoverable despite the reasonable diligence of SALISA and her mother, Ms. Ellis.

100.    That, to the extent that there exists an ostensible affirmative defense regarding the statute of limitations, said defense fails because, due as pled above, this fraudulent concealment served to toll the initiation of the statute of limitations period for causes of action pertaining to the investigation of SALISA's April 2008 attack is tolled to December 8, 2017.

101.    That the allegations against the added parties–CHRISTIAN, COHEN and FELTY–relate back to the original pleading because the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out in SALISA's original complaint.

102.    That justice requires that CHRISTIAN, COHEN and FELTY be added as party defendants in the matter.

103.    Moreover, that the added parties–CHRISTIAN, COHEN and FELTY–have received such notice of the action that none of them will be prejudiced in defending on the merits

and they each knew, or should have known, that the instant action would have been brought against them, but for a mistake or uncertainty concerning their proper identity.

**COUNT I**
**ALL DEFENDANTS**
**DENIAL OF CONSTITUTIONAL RIGHT OF ACCESS TO THE COURTS**

104.    SALISA hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and three (103) as and for Paragraph one-hundred and four (104) of Count I.

105.    The First and Fourteenth Amendments protect the rights of individuals, such as SALISA, to seek redress for claims that have a reasonable basis in law and fact. Efforts by state actors to impede an individual's access to courts or administrative agencies can provide the basis for a constitutional claim under 42 U.S.C. § 1983.

106.    Judicial access must be adequate, effective and meaningful and therefore, when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged.

107.    Litigants in cases alleging a denial of the constitutional right of access to the courts of this type must allege that there are specific cases that cannot now be tried (or tried with all material evidence) as a result of a defendant's conduct. The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case or the loss of an opportunity to seek some particular order of relief.

108.    Per KRS 500.050(1), the prosecution of a felony is not subject to a period of limitations and may be commenced at any time. Per KRS 500.050(2), the prosecution of an offense other than a felony must be commenced within one (1) year after it is committed. There is a one (1) year statute of limitations for torts in the Commonwealth of Kentucky. Thus, April 29, 2009 was the deadline for the criminal prosecution of any misdemeanors stemming from the attack on

SALISA, as well as the deadline for the filing of any classic tort actions against the assailant(s) stemming from the attack.

109.    That, under Kentucky law, bad faith can be predicated on a violation of causally related constitutional, statutory or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective reasonableness.

110.    That, under Kentucky law, one can also prove bad faith if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.

111.    Here, the LMPD fraudulently concealed the facts which would have given rise to a civil lawsuit against the assailant(s), whomever they might be, if they are ever identified. Therefore, the Commonwealth three (3) year statute of limitations for filing civil lawsuit based on battery and assault in the current action expired on April 29, 2011, at the very latest.

112.    SALISA's injuries were very serious and they caused an impairment in her ability to positively identify her attacker(s).   Therefore, SALISA depended upon and relied upon defendants to use their skills, technology and policy dictates to identify, charge and prosecute the attacker(s).   Moreover, identification of the attacker(s) was essential for SALISA to seek a civil judgment against the attacker(s).

113.    All defendants either engaged in specific conduct or assisted offending defendants in engaging in conduct and concealing conduct.   The misconduct committed by defendants was unnecessary and unreasonable, and caused SALISA significant injury.

114.    The acts of the defendants, and each of them, were not taken in good faith but, rather, in bad faith.

115.     By reason of the conduct of defendants, SALISA was deprived of rights, privileges and immunities secured to her by the First and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

116.     The acts of defendants were unnecessary, objectively unreasonable and malicious. Therefore, defendants are liable to SALISA in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

**COUNT II**
**ALL DEFENDANTS**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**

117.     SALISA hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and sixteen (116) above as and for Paragraph one-hundred and seventeen (117) of Count II.

118.     Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment.  Discriminatory intent implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker selected or reaffirmed a particular course of action at least in part because of–not merely in spite of–its adverse effects upon an identifiable group.

119.     SALISA is a member of an identifiable group.  As pled above, she is a female rape victim, of African-American descent, who has been treated differently on account of her gender. She further alleges that defendants acted with discriminatory intent in refusing to investigate criminal acts against her.

120.     An individual who alleges that a police officer intentionally treated her differently than other similarly-situated individuals and alleges that there was no rational basis for the difference in treatment, states a viable Fourteenth Amendment Equal Protection Claim.

121.     The actions taken by the defendants have violated SALISA's rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, in that she, as a female rape victim, has been afforded less favorable terms and conditions on the basis of her gender.

122.     SALISA has been deprived of her rights of equal protection under the law–and as of the date of this filing, continues to be deprived of these rights–on account of her *gender*, in violation of the Fourteenth Amendment to the United States Constitution, in that she has been afforded less favorable terms and conditions than similarly situated victims of crime and continues to be afforded less favorable terms and conditions.

123.     The acts of defendants were unnecessary, objectively unreasonable and malicious. Therefore, defendants are liable to SALISA in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

<u>**COUNT III**</u>
**ALL DEFENDANTS**
**GENDER-BASED CIVIL CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)**

124.     SALISA hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and twenty-three (123) above as and for Paragraph one-hundred and twenty-four (124) of Count III.

125.     The Sixth Circuit has held that women constitute a cognizable class under 42 U.S.C. § 1985(3).

28

126.    Starting on April 29, 2008 and continuing for over a decade up to, and including, December 2017, and beyond, defendants conspired among themselves and with others for the purpose of depriving, directly or indirectly, SALISA of equal protection under the law with the intent to deny her right to access the courts related to the violent assault she endured.

127.    Defendants engaged in a conspiracy among themselves and with others based on discriminatory animus for the purpose of depriving, directly or indirectly, SALISA's right to equal protection under the law in violation of 42 U.S.C. § 1985*(3)*, with the object of that conspiracy being to conceal the fact that the complaints of crime made by female rape victims are less important to the LMPD than complaints made by similarly-situated male rape victims.

128.    Defendants conspired together to deprive SALISA of equal protection of the laws as alleged in this Complaint based on gender animosity toward SALISA as a female rape victim. Furthermore, defendants conspired among themselves and with others in order to conceal, specifically, WOOLRIDGE and CHRISTIAN's police misconduct occurring on April 29, 2008 *and beyond*, which reflected their gender hostility, and the fact that they *intentionally* breached their most basic police duties when they failed to aid SALISA, a female rape victim, and wantonly left her vulnerable to even greater danger and harm.

129.    In furtherance of that conspiracy, defendants engaged in oral, written, and electronic communications among themselves and with others regarding: a) their agreement not to complete SALISA's rape kit testing (utilized exclusively upon female rape victims); b) the actions taken to prevent the testing; and c) their efforts to conceal these unconstitutional actions, including misrepresented material facts to SALISA and Ms. Ellis, and withholding documents and information from them.

29

130.    As a result of that conspiracy, for over ten (10) years, the unconstitutional acts and omissions of defendants violating SALISA's Equal Protection rights of the law has been unknown to SALISA as a result of said conspiracy.

131.    As a result of that conspiracy, for over ten (10) years, SALISA has suffered and continues to suffer significant physical and emotional injury SALISA has suffered tremendous emotional distress and other significant forms of damages.

132.    The acts of defendants were unnecessary, objectively unreasonable and malicious. Therefore, defendants are liable to SALISA in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

**COUNT IV**
**ROBERT C. WHITE AND STEVE CONRAD**
**UNCONSTITUTIONAL MONELL CUSTOM**

133.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and thirty-two (132) above as and for Paragraph one-hundred and thirty-three (133) of Count IV.

134.    At all relevant times, including April 2008, and for years prior thereto, WHITE and CONRAD, final policymakers, knowingly, and/or with reckless or callous indifference to the constitutional rights of the citizens of Louisville, permitted and/or maintained a widespread "custom" of allowing an historical pattern of tampering, concealing, compromising and/or destroying female rape victims' rape kits while they were in the possession and/or control of LMPD.

135.    WHITE and CONRAD permitted this custom by:

    a) disregarding, ignoring and/or covering up allegations of investigatory police misconduct;

30

b) allowing violations of police policy, including those intended to protect female rape victims and ensure a legitimate investigation of their criminal cases; and

c) allowing an historical pattern of tampering, concealing, compromising and/or destroying female rape victims' rape kits while they were in the possession and/or control of LMPD.

136. This pattern of police misconduct was so pervasive as to constitute a "custom or usage" with the force of law.

137. The pattern of police misconduct of which Plaintiff complains herein was the subject of a December 2019 Kentucky Center for Investigative Reporting (KyCIR) article, *Prosecution Denied* (hereafter "2019 article"). The 2019 article revealed that 194 people reported a rape to the LMPD in 2017, resulting in only four (4) convictions. The 2019 article stated that "[a]ccording to FBI guidelines and LMPD's own rules, ["cleared by exception"] means that police have identified a suspect, they know where that person is and they have enough evidence to make an arrest. But they don't, because of an exceptional circumstance beyond law enforcement's control…"

138. Based on the 2019 article, LMPD cleared three (3) times as many 2017 rape cases "by exception" than they did by arrest. Based on the 2019 article, "LMPD closes nearly half of all rape cases by exception and arrests fewer suspects than the national average. In the 15 percent of rape cases that did end in arrest, the vast majority of defendants saw their rape charge amended, or dropped altogether, in exchange for a guilty plea on other charges."

139. A portion of the 2019 article reads as follows:

"According to statistics LMPD provided to the FBI, 175 rapes were reported in Louisville in 2017. When [KyCIR] requested case summaries for all 2017 rapes from LMPD, [KyCIR] received 194 files. It's unclear why the numbers differ…That same year, Nashville, Tenn., reported 492 rapes to the FBI. Kansas City,

Missouri reported 445.  Lexington, with half the population of Louisville, reported 200."

140.    In response to the LMPD rape reporting statistics in the 2019 article, LMPD spokesperson Jessie Halladay said Louisville's low reporting numbers can be blamed on the media.

141.    In response to evidence presented in the 2019 article which reflects rape investigation failures—such as the failure to properly collect evidence from the scene of the rape—Lt. Shannon Lauder, of LMPD's Special Victims Unit, disputed that her detectives eve did a minimal investigation of a rape.  Lt. Lauder went on to tell a KyCIR reporter:

> "I'm not going to sit here and allow you to act like my detectives are not thoroughly investigating cases because it's going to sound good for your article…That's reckless of you, it doesn't serve victims for you to say that, and I don't appreciate it."

142.    The 2019 article included evidence of a LMPD rape investigation victim advocate being untruthful with a rape victim by telling her that the investigation of her rape was ongoing.

143.    The pattern of police misconduct of which Plaintiff complains herein was also the subject of a December 2018 KyCIR article, *Louisville Police Close More Than Half Of Rape Cases Without Arresting Anyone* (hereafter "2018 article").

144.    According to the 2018 article:

> "[LMPD] officers determined that arrests were just not possible in 51 percent of all 2014-16 rape cases.
>
> The LMPD used [the "cleared by exception"] designation more than twice as often as they arrested suspected rapists.  And a national investigation shows they used it more than almost every other large police department.
>
> An investigation from ProPublica, Newsy and Reveal from the Center for Investigative Reporting found that dozens of law enforcement agencies made it seem like they solved a significant share of their rape cases through exceptional clearance, when the cases were simply closed.  The news organizations shared data with KyCIR from 64 police departments serving populations of 300,000

32

or more.  That data shows Louisville had the sixth-highest rate of clearing rape cases by exceptional means."

145.    The custom described above was the moving force behind the violations of SALISA's constitutional rights committed by defendants, and each of them, and proximately caused her personal injuries, great pain and other damages.  The custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to SALISA by the Fourth and Fourteenth Amendments to the United States Constitution, including due process, and laws enacted thereunder.

146.    As a result of the customs described above, SALISA was subjected to personal injuries, great pain and other damages, and as a result, WHITE and CONRAD are liable to SALISA in damages under 42 U.S.C. § 1983, including pain and suffering, punitive damages and other damages.

WHEREFORE, Plaintiff, SALISA LUSTER HARRISON, by and through her attorneys, and requests judgment against defendants, and each of them:

1.  That the defendants be required to pay SALISA LUSTER HARRISON's compensatory damages;

2.  That the defendants be required to pay actual damages;

3.  That the defendants be required to pay costs and attorney fees per 42 U.S.C. § 1988; and

4.  That SALISA LUSTER HARRISON have any other such relief as this Honorable Court deems just and proper.

Respectfully submitted,

/s/ Michael J. Laux
Michael J. Laux
*Pro Hac Vice* Admission
One of the Attorneys for PLAINTIFF
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700

Little Rock, AR 72201
Telephone: (501) 242-0750
E-mail: mlaux@lauxlawgroup.com

Benjamin L. Crump
*Pro Hac Vice* Admission
One of the Attorneys for PLAINTIFF
BEN CRUMP, PLLC
122 S. Calhoun Street
Tallahassee, FL 32301
Telephone: (850) 224-2020
E-mail: ben@bencrump.com

and

Lonita K. Baker
Kentucky Bar No. 91480
One of the Attorneys for PLAINTIFF
SAM AGUIAR INJURY LAWYERS
1201 Story Ave.
Louisville, KY 40206
Telephone: (502) 785-3822
E-mail: lonita.baker@gmail.com

34